Filed 5/3/16 (unmodified opinion attached) (review denied 8/22/16; reposted to include Supreme Court statements upon denial of review)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BEATRIZ VERGARA, a Minor, etc., et al., <br><br>     Plaintiffs and Respondents, <br><br> v. <br><br> STATE OF CALIFORNIA et al., <br><br>     Defendants and Appellants; <br><br> CALIFORNIA TEACHERS ASSOCIATION et al., <br><br>     Interveners and Appellants. | B258589 <br><br> (Los Angeles County <br> Super. Ct. No. BC484642) <br><br> **ORDER MODIFYING OPINION** <br><br> [No Change in Judgment] |

THE COURT:

It is ordered that the opinion filed herein on April 14, 2016, be modified as follows:

Page 8, footnote 2, add the following language to the last sentence of the footnote immediately preceding the citations to *In re Marriage Cases* and *White v. Davis*:  that affect the very fabric of personnel decisions for teachers throughout California.

Footnote 2 now reads in its entirety:

At the time of trial, defendants were:  The State of California; Edmund G. Brown, Jr., in his official capacity as Governor of California; the California Department of Education (CDE); the State Board of Education; and Tom Torlakson, in his official capacity as State Superintendent of Public Instruction (the State defendants); as well as California Teachers Association and the California Federation of Teachers (the intervener

defendants), who were granted leave to intervene as defendants prior to trial.  The State defendants and the intervener defendants filed separate briefs on appeal.  Because the positions taken by the two sets of defendants are, for the most part, essentially identical, we generally refer to defendants collectively in this opinion.  We reject the State defendants' contention that the governor is an improper defendant.  Because public education is ultimately a state obligation (*Butt*, *supra*, 4 Cal.4th 668, 680) and "[t]he supreme executive power of this State is vested in the Governor" (Cal. Const., art. V, § 1), the Governor is a proper defendant in this lawsuit mounting a facial challenge to five statutes of state-wide application that affect the very fabric of personnel decisions for teachers throughout California.  (See also *In re Marriage Cases* (2008) 43 Cal.4th 757 [Governor named as defendant]; *White v. Davis* (2003) 30 Cal.4th 528 [same].)

This modification does not effect a change in judgment.

Filed 4/14/16 (unmodified version) (review denied 8/22/16; reposted to include Supreme Court statements upon denial of review)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BEATRIZ VERGARA, a Minor, etc., et al., | B258589 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC484642) |
| v. | |
| STATE OF CALIFORNIA et al., | |
| Defendants and Appellants; | |
| CALIFORNIA TEACHERS ASSOCIATION et al., | |
| Interveners and Appellants. | |

APPEALS from a judgment of the Superior Court of Los Angeles County. Rolf M. Treu, Judge. Reversed and remanded.

Kamala D. Harris, Attorney General, Edward C. DuMont, Solicitor General, Julie Weng-Gutierrez, Assistant Attorney General, Janill L. Richards, Gregory D. Brown and Aimee Feinberg, Deputy Solicitors General, Susan M. Carson and Nimrod P. Elias, Deputy Attorneys General, for Defendants and Appellants the State of California; Edmund G. Brown, Jr., in his official capacity as Governor of California; the California Department of Education; the State Board of Education; and Tom Torlakson, in his official capacity as State Superintendent of Public Instruction.

Rothner Segall & Greenstone, Glenn Rothner; Altshuler Berzon, Michael Rubin, Stacey M. Leyton, Eileen B. Goldsmith and P. Casey Pitts for Interveners and Appellants California Teachers Association and California Federation of Teachers.

Reed Smith, Paul D. Fogel, Raymond A. Cardozo, Thomas A. Evans and Kevin M. Hara; Jennifer W. Bezoza, Travis Silva and Dana M. Isaac for Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Education Law Center, Equal Justice Society, Southern Poverty Law Center and Asian Americans Advancing Justice— Los Angeles as Amici Curiae on behalf of Appellants.

Catherine L. Fisk and Erwin Chemerinsky, University of California, Irvine Law for Constitutional Law Professors as Amicus Curiae on behalf of Appellants.

Stroock & Stroock & Lavan, Steven D. Atlee, Christine E. Ellice, Charles G. Moerdler, Alan M. Klinger, Beth A. Norton, Dina Kolker, David J. Kahne and Nathan H. Stopper; David Strom for American Federation of Teachers, AFL-CIO, as Amicus Curiae on behalf of Appellants.

Judith A. Scott, James & Hoffman and Claire P. Prestel for Service Employees International Union as Amicus on behalf of Appellants; Matthew S. Blumin and Michael Artz for American Federation of State, County and Municipal Employees as Amicus Curiae on behalf of Appellants; Michael R. Clancy for California School Employees Association as Amicus Curiae on behalf of Appellants; Kathryn Sheffield for California Faculty Association as Amicus Curiae on behalf of Appellants.

Persyn Law & Policy and Mary Kelly Persyn; Ronald A. Peterson Law Clinic, Charlotte Garden, Lorraine Bannai and Robert Chang for California Teachers, American-Arab Anti-Discrimination Committee, Fred T. Korematsu Center for Law & Equality and American Association of University Professors as Amici Curiae on behalf of Appellants.

Donahue & Goldberg and Sean H. Donahue; Schwartz, Steinsapir, Dohrmann & Sommers and Henry M. Willis for Kevin Beiser, Joan Buchanan, Ciro C. Calderon, Rob Collins, Tom Conry, Jennifer Freemon, Matt Haney, Michael Harrelson, Richard Hoy, Sarah Kirby-Gonzalez, Rob Nunez, Erik Ortega, Cecilia Perez, Annemarie Randle-Trejo, Claudia Rossi, Ryan Anthony Ruelas, Noelani Sallings, Shamann Walton, Steve Waterman and Steve Zimmer as Amici Curiae on behalf of Appellants.

Alice O'Brien, Eric A. Harrington, Kristen Hollar and Derrick Ward for National Education Association as Amicus Curiae on behalf of Appellants.

Keker & Van Nest, Steven A. Hirsch and Katherine M. Lloyd-Lovett for Education Deans, Professors and Scholars as Amicus Curiae on behalf of Appellants.

Gibson, Dunn & Crutcher, Theodore B. Olson, Joshua S. Lipshutz, Kevin J. Ring-Dowell, Theodore J. Boutrous, Jr., Marcellus A. McRae, Theane D. Evangelis and Enrique A. Monagas for Plaintiffs and Respondents.

Kaufhold Gaskin, Steven S. Kaufhold, Janathan B. Gaskin and Quynh K. Vu for Students Transforming Education, Jan Bauer, Priscilla Davis, Dan Tick, Paula Tillotson, Neva Sullaway and, Ann Wellman as Amici Curiae on behalf of Respondents.

Kronick, Moskovitz, Tiedemann & Girard, Christian M. Keiner and Chelsea Olson for California County Superintendents Education Services Association as Amicus Curiae on behalf of Respondents.

Sidley Austin, Michelle B. Goodman, James D. Arden, Peter D. Kauffman for National Council on Teacher Quality and The New Teacher Project as Amici Curiae on behalf of Respondents.

3

Shook, Hardy & Bacon, Tristan L. Duncan, Laurence H. Tribe, Tammy B. Webb for Constitutional Scholars; Rachel F. Moran, Michael J. Connell, Dawinder S. Sidhu as Amici Curiae on behalf of Respondents.

Lubin Olson & Niewiadomski, Jonathan E. Sommer and Kyle A. Withers for Betheny Gross, Jane Hannaway, Cory Koedel and Jonah Rockoff as Amici Curiae on behalf of Respondents.

Arnold & Porter, Douglas A. Winthrop and Christopher T. Scanlan for Students First as Amicus Curiae on behalf of Respondents.

Horvitz & Levy, Jeremy B. Rosen, Robert H. Wright and Emily V. Cuatto for Silicon Valley Leadership Group, California Business Roundtable, Foundation for Excellence in Education, Orange County Business Council, California Chamber of Commerce and Valley Industry & Commerce Association as Amici Curiae on behalf of Respondents.

Jenner & Block, Kenneth K. Lee, L. David Russell and Andrew G. Sullivan for Education Trust—West, Oakland Alliance of Black Educators, Los Angeles Urban League, Black Alliance for Education Options as Amici Curiae on behalf of Respondents.

Dannis Woliver Kelley and Sue Ann Salmon Evans; Lozano Smith, Michael Smith, Dulcinea Grantham, Keith J. Bray and Joshua R. Daniels for Education Legal Alliance of the California School Boards Association as Amicus Curiae on behalf of Respondents.

4

White & Case, Bryan A. Merryman, Elliott E. Dionisio and J. Taylor Akerblom for Governors Arnold Schwarzenegger and Pete Wilson as Amici Curiae on behalf of Respondents.

Chandler & Shechet, Aaron Nathan Shechet and Leigh Anne Chandler for Adam Kuppersmith, Karen Sykes-Orpe and Katherine Czujko as for Amici Curiae on behalf of Respondents.

Fagen Friedman & Fulfrost, Roy A. Combs, David Mishook and Alejandra Leon for Association of California School Administrators as Amicus Curiae on behalf of Respondents.

Proskauer Rose, Lois D. Thompson and Irina Constantin for Current and Former School Superintendents John White, Hanna Skandera, Paul Pastorek, Kevin S. Huffman and Cami Anderson as Amici Curiae on behalf of Respondents.

_____

5

In this lawsuit, nine students who were attending California public schools sued the State of California and several state officials, seeking a court order declaring various provisions of California's Education Code unconstitutional. According to plaintiffs, these provisions, which govern how K-12 public school teachers obtain tenure, how they are dismissed, and how they are laid off on the basis of seniority, violate the California Constitution's guarantee that all citizens enjoy the "equal protection of the laws." (Cal. Const., art. I, § 7, subd. (a).) The matter went to trial. After hearing eight weeks of evidence, the trial court issued a ruling declaring five sections of the Education Code— sections 44929.21, subdivision (b), 44934, 44938, subdivisions (b)(1) and (b)(2), 44944, and 44955[1]— unconstitutional and void. Defendants have appealed this judgment.

We reverse the trial court's decision. Plaintiffs failed to establish that the challenged statutes violate equal protection, primarily because they did not show that the statutes inevitably cause a certain group of students to receive an education inferior to the education received by other students. Although the statutes may lead to the hiring and retention of more ineffective teachers than a hypothetical alternative system would, the statutes do not address the assignment of teachers; instead, administrators—not the statutes—ultimately determine where teachers within a district are assigned to teach. Critically, plaintiffs failed to show that the statutes themselves make any certain group of students more likely to be taught by ineffective teachers than any other group of students.

With no proper showing of a constitutional violation, the court is without power to strike down the challenged statutes. The court's job is merely to determine whether the statutes are constitutional, not if they are "a good idea." (*McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 388.) Additionally, our review is limited to the particular constitutional challenge that plaintiffs decided to bring. Plaintiffs brought a facial equal protection challenge, meaning they challenged the statutes themselves, not how the statutes are implemented in particular school districts. Since plaintiffs did not

---

[1] Unless otherwise indicated, all further statutory references are to the Education Code.

demonstrate that the statutes violate equal protection on their face, the judgment cannot be affirmed.

**BACKGROUND**

## I. California's educational system

The California Constitution requires "[t]he Legislature [to] provide for a system of common schools." (Cal. Const., art. IX, § 5.) Pursuant to this command, the state is obligated to provide a free public education. (*Los Angeles Unified School Dist. v. Garcia* (2013) 58 Cal.4th 175, 182.) "'[M]anagement and control of the public schools [is] a matter of state[, not local,] care and supervision. . . .'" (*Butt v. State of California* (1992) 4 Cal.4th 668, 681 (*Butt*).)

The California Constitution also provides for the incorporation and organization of school districts by the Legislature. (Cal. Const., art. IX, § 14.) Local school districts, as agents of the state, are responsible for implementation of educational programs and activities. (*Ibid.*; *Butt*, *supra*, 4 Cal.4th 668, 681.) "[T]he Legislature has assigned much of the governance of the public schools to the local districts." (*Butt*, at p. 681.)

School districts are expected to operate as "strong, vigorous, and properly organized local school administrative units." (§ 14000.) To this end, the Legislature has granted each district (through its governing board) the power to hire teachers (§§ 44830-44834), to dismiss teachers (§§ 44932-44944), to fix teachers' compensation (§§ 45022, 45032), and to accept their resignations (§ 44930). (See generally *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 871; *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916-918.)

The power to assign teachers to specific schools or to transfer teachers between schools within a district belongs to the district's superintendent (§ 35035, subds. (e), (f)), subject to conditions imposed by collective bargaining agreements (see Gov. Code, § 3543.2; *United Teachers of Los Angeles v. Los Angeles Unified School Dist.* (2012) 54 Cal.4th 504, 515 [teacher transfer and reassignment policies are proper subjects of collective bargaining]), and by statute (see § 35036, subd. (a) [prohibiting transfer of a teacher to a low-performing school when principal objects]).

7

## II. **The operative complaint**

In their operative first amended complaint against defendants,[2] plaintiffs claimed that the challenged statutes negatively impacted their right to an education by causing "grossly ineffective" teachers to become employed and retain their employment in the school system. Specifically, plaintiffs contended that: (1) the "tenure statute" (§ 44929.21, subd. (b)) forced school districts to decide whether new, probationary teachers should be granted tenure before the teachers' effectiveness could be determined; (2) the "dismissal statutes" (§§ 44934; 44938, subds. (b)(1), (2); 44944) made it nearly impossible to dismiss poorly performing teachers; and (3) the "reduction-in-force statute" (§ 44955) required school districts, in the event of layoffs, to terminate teachers based on seniority alone, regardless of their teaching effectiveness.

The first amended complaint identified two groups of students who allegedly were denied equal protection because of the challenged statutes. The first group (Group 1) was a "subset" of the general student population, whose "fundamental right to education" was adversely impacted due to being assigned to grossly ineffective teachers. According to plaintiffs, the students comprising this subset were located throughout the state, in all sorts of schools, and were of substantially the same age and aptitude as students of the

---

[2]     At the time of trial, defendants were: The State of California; Edmund G. Brown, Jr., in his official capacity as Governor of California; the California Department of Education (CDE); the State Board of Education; and Tom Torlakson, in his official capacity as State Superintendent of Public Instruction (the State defendants); as well as California Teachers Association and the California Federation of Teachers (the intervener defendants), who were granted leave to intervene as defendants prior to trial. The State defendants and the intervener defendants filed separate briefs on appeal. Because the positions taken by the two sets of defendants are, for the most part, essentially identical, we generally refer to defendants collectively in this opinion. We reject the State defendants' contention that the governor is an improper defendant. Because public education is ultimately a state obligation (*Butt*, *supra*, 4 Cal.4th 668, 680) and "[t]he supreme executive power of this State is vested in the Governor" (Cal. Const., art. V, § 1), the Governor is a proper defendant in this lawsuit mounting a facial challenge to five statutes of state-wide application. (See also *In re Marriage Cases* (2008) 43 Cal.4th 757 [Governor named as defendant]; *White v. Davis* (2003) 30 Cal.4th 528 [same].)

8

general population. The Group 1 members were disadvantaged, however, because they received a lesser education than students not assigned to grossly ineffective teachers.

The second group (Group 2) allegedly impacted by the challenged statutes was made up of minority and economically disadvantaged students. Plaintiffs alleged that schools predominantly serving these students have more than their proportionate share of grossly ineffective teachers, making assignment to a grossly ineffective teacher more likely for a poor and/or minority student.

The operative complaint sought a judgment (i) declaring the challenged statutes unconstitutional for violating equal protection provisions of the California Constitution and (ii) enjoining their enforcement.

## III. The challenged statutes

### A. Tenure statute

Under the tenure statute, in districts with more than 250 students, a probationary teacher becomes a "permanent employee of the district" after finishing "two complete consecutive school years in a position or positions requiring certification . . . ." (§ 44929.21, subd. (b).) Each such district must notify a probationary teacher, on or before March 15 of the teacher's second consecutive school year, whether he or she will be reelected as a permanent employee. (*Ibid.*) If a probationary teacher is not provided notice by March 15, the teacher is deemed reelected. (*Ibid.*)

### B. Dismissal statutes

#### 1. Statutes at time of trial

At the time of trial,[3] the dismissal statutes operated as follows:

Under section 44938, subdivision (b)(1), a school district that intends to dismiss a permanent certificated teacher for "unsatisfactory performance" must provide the teacher

---

[3] In 2014, the Legislature enacted Assembly Bill No. 215 (2013-2014 Reg. Sess.) (Stats. 2014, ch. 55, §§ 3, 15), which made several changes to two of the dismissal statutes, sections 44934 and 44944. These changes took effect on January 1, 2015, after judgment was entered in this matter.

with a "written notice of the unsatisfactory performance" specifying instances of unsatisfactory behavior with enough particularity to allow the teacher an opportunity to correct his or her faults. In order for the district to proceed with the dismissal process in the same school year, it must issue the written notice prior to the last quarter of the school year. (§ 44938, subd. (b)(2).) After the written notice is issued, the teacher is provided at least 90 days to attempt to correct his or her deficient performance and overcome the grounds for the charge. (§ 44938, subd. (b)(1).)

Then, after the 90-day period has lapsed, the district must file a written statement of charges and "give notice to the permanent employee of its intention to dismiss . . . ." (Former § 44934.) The statement of charges of unsatisfactory performance must specify instances of the teacher's behavior and the conduct constituting the charge, the statutes and rules violated (where applicable), and "the facts relevant to each occasion of alleged . . . unsatisfactory performance." (*Ibid.*)

The teacher then has another 30 days to request a hearing on the dismissal charges. (Former § 44934.) The hearing shall commence within 60 days of the teacher's request. (Former § 44944, subd. (a)(1).) The dismissal hearing is conducted by a three-member panel called a "Commission on Professional Competence" (CPC), made up of one administrative law judge and two teachers, one selected by the teacher subject to the hearing and the other selected by the district. (Former § 44944, subds. (b)(1), (2).) Parties to a CPC hearing have discovery rights generally equivalent to those of a party to a civil action brought in superior court. (Former § 44944, subd. (a)(1).)

Following the conclusion of the CPC hearing, the CPC must issue "a written decision containing findings of fact, determination of issues, and a disposition" to either dismiss the subject teacher, suspend the teacher for a specific period of time, or not suspend or dismiss the teacher. (Former § 44944, subd. (c)(1).) The written decision is deemed the "final decision" of the district. (Former § 44944, subd. (c)(4).) If the CPC determines that the teacher should not be dismissed or suspended, the district is required to pay the expenses for the dismissal hearing and the teacher's attorney fees. (Former § 44944, subd. (e)(2).) If the teacher is dismissed or suspended, the parties split the

10

expenses of the hearing and pay their own attorney fees.  (Former § 44944, subd. (e)(1).)
A party may seek judicial review of the CPC's decision.  (§ 44945.)

      2.  <u>2015 changes</u>

Aside from altering the order and notation of subdivisions, the 2015 revisions to the dismissal statutes made several other changes.

Among other changes, section 44934, subdivision (d), amending former section 44934, now requires a showing of "good cause" to amend written charges less than 90 days before the dismissal hearing.  Section 44944, subdivisions (b)(1)(A) and (B), amending former section 44944, subdivision (a)(1), now require a CPC hearing to generally be commenced within six months of an employee's demand for a hearing, and for the hearing to generally be completed "by a closing of the record" within seven months of the demand for a hearing, unless these deadlines are extended by the administrative law judge.  Section 44944, subdivision (c)(4), now allows a party to object to the member of the CPC selected by the opposing party.  Alternatively, under the revised section 44944, subdivision (c)(1), if the parties mutually agree, they may waive the right to convene a three member CPC and instead have the matter be determined by a single administrative law judge.  Discovery provisions, formerly found in section 44944, subdivision (a), were also revised.  Newly enacted section 44944.05 requires parties to make initial disclosures of witnesses and documents, restricts parties to five depositions per side absent good cause, and provides that discovery disputes be resolved by the administrative law judge.  (§ 44944.05, subds. (a), (c), (d).)

**C. Reduction-in-force statute**

When a school district must "decrease the number of permanent employees in the district" pursuant to section 44955, "the services of no permanent employee may be terminated . . . while any probationary employee, or any other employee with less seniority, is retained to render a service which said permanent employee is certificated and competent to render."  (§ 44955, subd. (b).)  This seniority system requires that permanent teachers be terminated in "the inverse of the order in which they were

11

employed" (§ 44955, subd. (c)), meaning that a permanent teacher generally cannot be terminated unless all teachers with less seniority have been terminated.

Two exceptions allow a district to deviate from the seniority system in certain circumstances:  (1) if "[t]he district demonstrates a specific need for personnel to teach a specific course or course of study" and the junior certificated teacher has special training and experience that teachers with more seniority do not possess (§ 44955, subd. (d)(1)), or (2) to maintain or achieve "compliance with constitutional requirements related to equal protection of the laws" (§ 44955, subd. (d)(2)).

## IV.  Trial

Plaintiffs initially sued three school districts (Los Angeles Unified School District, Oakland Unified School District, and Alum Rock Union) in addition to the State defendants.  Prior to trial, plaintiffs dismissed these districts as defendants, opting to pursue a facial challenge to the statutes instead of one focusing on implementation.

The trial court conducted a bench trial.  Over 50 lay and expert witnesses testified, including teachers, principals, superintendents, and CDE employees.

### A.  Plaintiffs' evidence

#### 1.  The importance of effective teachers

At trial, plaintiffs elicited testimony from numerous witnesses who agreed that effective teachers are vital to a child's education.  Along these lines, plaintiffs introduced into evidence a CDE publication stating, "The academic success of California's diverse students is inextricably tied to the quality and commitment of our educator workforce."

Plaintiffs called expert witnesses who testified that a teacher's effectiveness can be assessed and measured, and that ineffective teachers can be identified.  Raj Chetty, a professor of economics at Harvard University, conducted a voluminous analysis of school and tax records, and concluded that teacher effectiveness has a profound effect on students' long-term success, including whether they attend college and how much they earn as adults.  Chetty opined, based on studies he conducted using "VAM"—"value-added" modeling or methodology—that having a highly effective teacher significantly improves a child's outcomes, while having a highly ineffective teacher does substantial

12

harm.  According to Chetty, highly ineffective teachers, which he defined as the worst 5 percent of teachers (based on value-added measurements), had long-term negative impacts.  He estimated that the lifetime aggregate earnings of a classroom of students taught for one year by a highly ineffective teacher was $1.4 million less than a classroom taught by an average teacher.

Thomas Kane, a professor of education and economics at the Harvard Graduate School of Education, conducted a study concluding that effective and ineffective teachers could be identified by measures including student achievement gains, as well as classroom observations and student surveys.  Based on a study of Los Angeles Unified School District (LAUSD), which included data on 58,000 teachers and 3.9 million student test scores (but did not include classroom observations or student surveys), Kane determined that students assigned to teachers in the lowest 50th percentile of effectiveness lost an estimated nine and one-half to 11 and one-half months of learning when compared to students assigned to an average teacher.

Numerous other witnesses testified that highly ineffective teachers impede a child's access to a reasonable education.  Furthermore, although a host of factors, including child poverty and safety, affect student achievement, teachers nevertheless have a highly important and significant impact on student learning.

### 2.  Difficulties with the challenged statutes

Various witnesses testified that the period provided for in the tenure statute is too short for administrators to make a reasoned determination of a probationary teacher's effectiveness when deciding whether to reelect the teacher as a permanent employee. The statute requires that a probationary teacher be notified of any reelection decision by March 15 of the teacher's second year (§ 44929.21, subd. (b)), but, because the process of evaluating a reelection decision takes time, principals generally must determine before March whether a teacher should be reelected.[4]

---

[4]    Evidence showed that California was one of five states nationwide with a probationary period of two years or fewer.

13

Witnesses familiar with the process estimated that, including summer months, principals have approximately 16 months to make a reelection decision. One witness, John Deasy, then-superintendent of LAUSD, testified that there is "no way" the time provided by the statute is "a sufficient amount of time to make . . . that incredibly important judgment" of reelection. Another witness, Mark Douglas, assistant superintendent in the Fullerton School District, stated that most teachers do not "hit full stride" until three to five years of teaching, and that it could be a "crapshoot" determining whether a beginning teacher would develop into an effective one. Two expert witnesses called by defendants testified consistently, both agreeing that a probationary period of three to five years would be superior to the current timeline for identifying teachers worthy of reelection. According to several witnesses called by plaintiffs, the tenure statute's short probationary period prevented administrators from making adequately informed reelection decisions, resulting in highly ineffective teachers being retained as permanent employees.

Plaintiffs also presented evidence relevant to their assertion that the process of dismissing a teacher for unsatisfactory performance is time-consuming and expensive. Performance-based teacher dismissal proceedings lasted anywhere from one to 10 years before completion, and costs ranged from $50,000 to $450,000. In addition to the proceeding itself, the process of documenting a teacher's deficiencies could take years. Witnesses familiar with the dismissal process testified that the time and cost of the proceedings were a significant disincentive to initiating dismissal proceedings. Because of these issues, districts rarely proceeded with formal dismissal proceedings against highly ineffective teachers. Plaintiffs presented evidence showing that, from 2003 to 2013, approximately two teachers statewide were dismissed on average per year for unsatisfactory performance by completion of the full formal dismissal process, out of an approximate total K-12 public school teacher population of 277,000. Meanwhile, the chief labor negotiator and former chief human resources officer of LAUSD, Vivian Ekchian, testified that during the 2012-2013 school year alone, LAUSD would have

14

sought to dismiss approximately 350 teachers for unsatisfactory performance if the dismissal process were streamlined.

Regarding the reduction-in-force statute, plaintiffs' witnesses testified that the seniority system often resulted in highly effective teachers being terminated while grossly ineffective teachers kept their jobs.[5]  According to Douglas, this situation occurred because, "The layoff process is denoted by seniority, not on skills."  A further effect of the seniority system was that it could lead local administrators to replace a laid-off teacher with one unfamiliar with the subject matter.  Using data on LAUSD student test scores and teacher assignments, Chetty calculated that 48 percent of teachers terminated during reductions-in-force were more effective than the average teacher in the district, while approximately 5 percent of teachers terminated were above the 95th percentile in terms of effectiveness—meaning that retentions under the seniority system have little if any correlation with effectiveness.

### 3.  Low-income and minority students

Plaintiffs presented evidence that ineffective teachers are often transferred into and concentrated in schools that predominantly serve minority[6] and low-income children. Douglas testified about a phenomenon, referred to colloquially as the "dance of the lemons," in which certain principals, seeking to improve the quality of their own schools' teacher pool, attempt to transfer poorly performing teachers to other schools within the district.  According to Douglas, the poorly performing teachers often end up at schools serving poor and minority students because, unlike schools serving more affluent

---

[5]    Plaintiffs' evidence demonstrated California was one of 10 states that mandate seniority be considered when conducting teacher layoffs.

[6]    The minority children referred to at trial included Latino and African-American students.  From evidence presented in the case, it appears that Latino students constitute approximately 50 percent of California public school children, making the term "minority" a possible misnomer in this context.  Nevertheless, for purposes of consistency with the record and the appellate briefs, our use of the term "minority" includes reference to Latino students.

15

students, students at schools impacted by the transfers generally have "families who aren't used to the education system . . . [and] don't know what to look for in a great teacher . . . . And so sometimes they won't complain about a teacher that [is] at low-end schools because they are not familiar and [do not] know how to navigate through the system. And so a teacher can exist without parent pressure at a lower-end school."[7] Bill Kappenhagen, a principal in the San Francisco Unified School District, also spoke of the "dance of the lemons" and how grossly ineffective teachers are "shuffled around from school to school," often landing in schools serving poor and minority students. A 2007 CDE publication corroborated this testimony, stating: "[T]ransfers often functioned as a mechanism for teacher removal. . . . Not surprisingly, the poorly performing teachers generally are removed from higher-income or higher-performing schools and placed in low-income and low-performing schools."

Plaintiffs' expert witness Kane testified that ineffective teachers in LAUSD are disproportionately assigned to African-American and Latino students. According to Kane, Latino and African-American students in LAUSD are, respectively, 68 percent and 43 percent more likely than white students to be taught by a teacher in the lowest 5 percent for effectiveness. Kane testified that this disproportionate distribution "could" be a result of the requirement of determining teacher effectiveness quickly due to the short probationary period, and the difficulties of dismissing ineffective teachers under the dismissal process. Kane further stated that, in a system where tenure decisions are made prematurely and dismissals are difficult to obtain, ineffective teachers will "tend to" accumulate in schools with the most teacher vacancies, which often are those serving Latino and African-American students.

Plaintiffs also presented evidence that schools in some districts serving low-income and minority students have higher proportions of inexperienced teachers and experience more layoffs. Arun Ramanathan, an expert witness retained by plaintiffs and

---

[7] Evidence showed that transfers of poorly performing teachers also had a disproportionate impact on such schools because they tended to have more vacancies.

executive director of an organization called Education Trust-West, testified that his organization conducted a study of three large California school districts and found that students attending schools in the highest poverty quartile were 65 percent more likely to experience a teacher layoff than those in the lowest poverty quartile. And Jonathan Raymond, former superintendent of the Sacramento City Unified School District, observed "a constant churn of the faculty and staff" at high-poverty, high-minority schools due to the seniority-based reduction-in-force statute.

### 4. Teacher assignment decisions

Witnesses called by plaintiffs acknowledged that decisions on how and where to assign and transfer teachers are made by local administrators, and that such decisions are often influenced by collective bargaining agreements between the districts and the teachers. Some collective bargaining agreements allow certain teachers to choose where they want to teach within a district. Teachers with such an option often choose not to teach at schools predominantly serving low-income and minority children because the schools can have challenging working conditions.

### B. Defendants' evidence

#### 1. Teacher effectiveness

David Berliner, an educational psychologist and professor emeritus from Arizona State University, testified that in-school effects on children's achievement were generally overstated when compared to out-of-school effects. Berliner opined that student test scores were rarely under a teacher's control, and were more often determined by peer-group composition of the group tested, including students' social class and their parents' educational level. Berliner estimated that teachers account for approximately 10 percent of variation in aggregate scores, with the remaining 90 percent attributable to other factors. Berliner further stated that VAM was "notoriously unreliable and therefore invalid" in assessing educational outcomes. Under cross-examination, however, Berliner acknowledged that a VAM analysis utilizing four years of data should be able to identify "very bad" teachers. He agreed that a small percentage of teachers—approximately

17

1 to 3 percent—consistently have strong negative effects on student outcomes, regardless of the classroom and school composition.

Linda Darling-Hammond, a professor of education at Stanford University, testified that there were several problems with using test scores as a definitive indicator of a teacher's effectiveness, including that tests often do not measure the material taught by a teacher, and that test score improvements or declines may be attributable to factors other than the teacher.

### 2. Purpose and implementation of the statutes

Several witnesses called by defendants testified that, in theory and practice, the challenged statutes protect teachers from arbitrary discipline and dismissal, and that they promote academic freedom. Jesse Rothstein, a professor of economics and public policy at the University of California, Berkeley, conducted a study regarding effects of the tenure and dismissal statutes, and found that the statutes help districts attract and retain teachers, because the statutes provide job security. Lynda Nichols, an education program consultant with the CDE and a former teacher, testified that during her teaching career, parents complained when she taught about subjects including Islam and Catholicism. Nichols believed that her status as a permanent employee, because it provided job protections, insulated her from potential retribution by parents and the local school board.

With regard to the probationary period provided by the tenure statute, Susan Mills, assistant superintendent of personnel for the Riverside Unified School District, testified that the period provided sufficient time to make a permanent employee reelection decision. Other witnesses called by defendants testified consistently. Deasy and Douglas, witnesses called by plaintiffs, stated that if administrators had any doubt about the effectiveness of a teacher prior to reelection, tenure would be refused. Deasy further acknowledged that when LAUSD moved from a "passive" tenure system to an "affirmative" one, requiring a more thorough review of a probationary teacher's abilities, the rate of tenure dropped from being "virtually automatic" to 50 percent. Darling-Hammond, defendants' expert witness, opined that the relatively short probationary period forced districts to make reelection decisions quickly, and that lengthening the

18

period could result in highly ineffective probationary teachers remaining in the classroom longer.

Multiple school administrators called by defendants testified that, under the dismissal statutory scheme, they are able to remove poorly performing teachers. Robert Fraisse, former superintendent of Laguna Beach Unified School District, Conejo Valley Unified School District, and Hueneme Elementary School District, testified that he was able to use various strategies for resolving dismissals short of the formal dismissal process. These included: letting poorly performing teachers know that there were serious concerns, which often led to resignation; paying a small amount of compensation in return for a resignation; and working with teachers' associations that could counsel suspect teachers to resign. Other administrators testified that the majority of potential teacher dismissals are resolved through resignation, settlement, retirement, or remediation rather than a CPC hearing.

Records from LAUSD showed that a larger number of teachers resigned to avoid the formal dismissal process than those who elected to go through the process. These records also showed that the number of teachers dismissed or resigning to avoid dismissal increased from a total of 16 in 2005-2006 to a total of 212 in 2012-2013. This change was due in part to an LAUSD policy of initiating the dismissal process whenever a teacher received two below-standard evaluations. From May 2007 through April 2013, LAUSD negotiated 191 settlements to informally resolve dismissal cases, with a total payout of slightly more than $5 million, approximately $26,000 per teacher.

As for the reduction-in-force statute, Fraisse testified that "it is a fair method that is perceived as fair," and that he was not aware of "a better, more objective system than seniority."[8] Defendants' expert Rothstein agreed, and believed that there were a number of advantages to a seniority-based system when compared to a performance-based one: it

---

[8]     Various witnesses testified that schools had utilized the skipping exception to the seniority requirement found in section 44955, subdivision (d)(1), to retain certain less-senior teachers.

was easier and less costly to administer, it allowed teachers to focus on teaching rather than test scores, and it was not subject to dubious evaluations of effectiveness. Other witnesses testified that incorporating effectiveness rankings into layoff decisions would deter cooperation among teachers. Susan Moore Johnson, a professor of education at the Harvard Graduate School of Education, conducted a study of four school districts in other jurisdictions with policies allowing for performance-based layoffs, and found that the districts opted to use seniority instead, because ranking for effectiveness was difficult and contentious.

###### 3. Teacher distribution

Witnesses called by both plaintiffs and defendants testified that decisions on how and where to assign and transfer teachers are determined by local school district administrators and collective bargaining agreements.

Defendants also presented evidence that societal circumstances pose challenges to the retention and assignment of teachers. According to a 2006 study, 22 percent of new teachers in California leave the profession within their first four years, and according to a 2001 study, the attrition rate nationally is 50 percent greater in high-poverty schools when compared to more affluent ones. Several witnesses stated that difficult working conditions impaired districts' efforts to recruit or retain experienced teachers at disadvantaged schools. Rothstein testified that, over the past half-century, teacher salaries had fallen a significant amount when compared to jobs requiring a similar degree of educational attainment.

Some districts attempted to address discrepancy between low- and high-income schools by assigning higher performers to lower income schools. Mills, the Riverside assistant superintendent, testified that there was no disparity in teacher quality between schools in her district serving low-income and higher-income students. Part of the reason was that the district tended to assign its "stronger leaders" to the poorer schools. Fraisse testified that during his years at Hueneme Elementary School District in the late 1990's, the district assigned its "best principals" to the highest-need schools, which encouraged highly effective teachers to migrate to those schools "because of the leadership."

20

## V.  **Statement of decision and judgment**

On June 10, 2014, the trial court issued a 16-page tentative decision, finding the challenged statutes unconstitutional under the equal protection clause of the California Constitution.

In its decision, the trial court noted that in *Serrano v. Priest* (1971) 5 Cal.3d 584 (*Serrano I*) and *Serrano v. Priest* (1976) 18 Cal.3d 728 (*Serrano II*), our Supreme Court held education to be a fundamental interest and struck down the then-operative school financing system for violating the equal protection provisions of the California Constitution (Cal. Const., art. IV, § 16; art. I, § 7).  (See *Serrano II*, *supra*, 18 Cal.3d 728, 776.)  The trial court also discussed *Butt*, in which the Supreme Court held that students in the Richmond Unified School District would be deprived of their right to basic educational equality if the district closed its schools six weeks early due to a budgetary shortfall.  (See *Butt*, *supra*, 4 Cal.4th 668, 685, 692.)  In light of this legal authority, the trial court characterized its task as determining whether the challenged statutes "cause the potential and/or unreasonable exposure of grossly ineffective teachers to all California students in general and to minority and/or low income students in particular, in violation of the equal protection clause of the California Constitution."  Answering this question affirmatively, the court determined that plaintiffs "met their burden of proof on all issues presented."

The trial court found that competent teachers are a critical component of the success of a child's educational experience, and that grossly ineffective teachers substantially undermine the ability of a child to succeed in school.  It further found that evidence presented at trial on the effects of grossly ineffective teachers was compelling and "shocks the conscience."  The court wrote there was "no dispute" that a significant number of grossly ineffective teachers are active in California classrooms and, based on the testimony of defendants' expert Berliner, estimated this number to comprise 1 to 3 percent of California teachers—or approximately 2,750 to 8,250 teachers.  Based on its determination that the challenged statutes (i) impose a "real and appreciable impact" on students' fundamental rights to equality of education, and (ii) "impose a disproportionate

21

burden on poor and minority students," the court employed a "strict scrutiny" examination of the challenged statutes.

With respect to the tenure statute, the trial court found "extensive evidence" that the probationary period "does not provide nearly enough time for an informed decision to be made regarding the decision of tenure." As a result, "teachers are being reelected who would not have been had more time been provided for the process," and students "are unnecessarily, and for no legally cognizable reason (let alone a compelling one), disadvantaged by the current [tenure statute]." The court determined that defendants had not met their burden under the strict scrutiny standard and declared the tenure statute unconstitutional.

Turning to the dismissal statutes, the trial court found that, based on the evidence presented, the dismissal process's time and costs cause districts to be very reluctant to commence dismissal procedures. Due to this situation, "grossly ineffective teachers are being left in the classroom because school officials do not wish to go through the time and expense to investigate and prosecute these cases." The court further found that due process for tenured teachers is a legitimate concern, but the dismissal statutes "present the issue of über due process." In concluding that defendants failed to meet their burden under the strict scrutiny standard, the court wrote: "There is no question that teachers should be afforded reasonable due process when their dismissals are sought. However, based on the evidence before this Court, it finds the current system . . . to be so complex, time consuming and expensive as to make an effective, efficient yet fair dismissal of a grossly ineffective teacher illusory."

Regarding the reduction-in-force statute, the trial court noted it contained no exception based on teacher effectiveness. Therefore, the court found, because the "last-hired" teacher is statutorily mandated to be "first fired" when layoffs occur, students are separated from competent junior teachers while incompetent teachers with seniority remain in the classroom. "The result is classroom disruption on two fronts, a lose-lose situation." Again, the court found that defendants did not carry their burden under the strict scrutiny test, and deemed the reduction-in-force statute unconstitutional.

22

Finally, the trial court determined that substantial evidence showed the challenged statutes disproportionately affect poor and/or minority students. Citing to the 2007 CDE report, it found that students attending high-poverty, low-performing schools were far more likely than wealthier peers to attend schools with a disproportionately high number of underqualified, inexperienced, and ineffective teachers. The court further found that the "dance of the lemons"—where poorly performing teachers are transferred from school to school—was caused by the lack of effective dismissal statutes and the reduction-in-force statute, and that it affected high-poverty and minority students disproportionately.

After the trial court issued its tentative decision, the parties each requested a statement of decision pursuant to Code of Civil Procedure section 632. In their request, defendants sought rulings on a broad set of subjects, including (i) whether plaintiffs, in bringing an equal protection challenge, were required to prove that the statutes classified students in an unequal manner; (ii) whether plaintiffs were required to prove that the statutes inevitably posed a total and fatal conflict with the right to basic educational equality; and (iii) whether school districts had the authority to decide where teachers would be assigned to teach. The trial court did not respond to these questions, but instead ruled that defendants' requests for statement of decision were improper because they covered matters going beyond the principal controverted issues at trial. The court ordered that its tentative decision become the proposed statement of decision and judgment. Defendants filed objections to the proposed statement of decision and judgment. The trial court overruled these objections, and issued the final statement of decision and judgment (the judgment) on August 27, 2014.

The judgment replicated the earlier-issued tentative decision, concluding that the challenged statutes are unconstitutional. The trial court ordered the statutes enjoined, and stayed all injunctions pending appellate review.

# DISCUSSION

## I. Key principles

### A. Review

The constitutionality of a statute is a question of law, which we review de novo. (*Sanchez v. State of California* (2009) 179 Cal.App.4th 467, 486 (*Sanchez*); *Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 360.)  De novo review is also the general standard of review when a mixed question of law and fact implicates constitutional rights.  (*People v. Cromer* (2001) 24 Cal.4th 889, 894; *Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448-449.)  Mixed questions of law and fact arise when """"historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.""""  (*People v. Cromer*, *supra*, 24 Cal.4th at p. 894, quoting *Ornelas v. United States* (1996) 517 U.S. 690, 696-697, *Pullman-Standard v. Swint* (1982) 456 U.S. 273, 289, fn. 19.)  De novo review is generally appropriate in such circumstances """"because usually the application of law to fact will require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles.""""  (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 385.)  To the extent our review requires us to analyze factual determinations based on evidence presented at trial, we review the trial court's findings of fact for substantial evidence.  (*Serrano II*, *supra*, 18 Cal.3d 728, 776; *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1127-1130.)

As with any legislative act, statutes relating to education are provided a presumption of constitutionality, and doubts are resolved in favor of a finding of validity.  (*Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 260 (*Arcadia Unified*).)  Our obligation as the court is to "enforce the limitations that the California Constitution imposes upon legislative measures" and determine if a statute violates constitutional protections.  (*In re Marriage Cases*, *supra*, 43 Cal.4th 757, 849-850.)  Policy judgments underlying a statute are left to the Legislature; the judiciary does

24

not pass on the wisdom of legislation. (*Estate of Horman* (1971) 5 Cal.3d 62, 77 ["Courts do not sit as super-legislatures to determine the wisdom, desirability or propriety of statutes enacted by the Legislature"]; *Gassman v. Governing Board* (1976) 18 Cal.3d 137, 148; *Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1219.)[9]

## B. Facial challenge

Both plaintiffs and defendants characterize this case—which seeks to enjoin any enforcement of the tenure, dismissal, and reduction-in-force statutes—as a facial challenge to the constitutionality of the subject statutes. "A facial challenge to the constitutional validity of a statute . . . considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 (*Tobe*); see also *id.* at pp. 1087-1088 [action, which sought to enjoin "*any* enforcement" of ordinance, was a facial attack].) In contrast, an "as applied" constitutional challenge seeks "relief from a specific application of a facially valid statute or ordinance," or an injunction against future application of the statute or ordinance in the manner in which it has previously been applied. (*Id.* at p. 1084; see also *Sanchez v. Modesto* (2006) 145 Cal.App.4th 660, 665.) A plaintiff seeking to void a statute as a whole for facial unconstitutionality "'cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, [the plaintiff] must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions.'" (*Arcadia Unified*, *supra*, 2 Cal.4th 251, 267.) A person may bring a facial challenge by showing that "the subject of [the] particular challenge has the effect of infringing some constitutional or statutory right" (*Holmes v. California Nat. Guard* (2001) 90 Cal.App.4th 297, 315), but need not necessarily show that he or she has personally suffered this infringement (see *ibid.*; *Arcadia Unified*, *supra*, 2 Cal.4th at p. 267; *In re M.S.* (1995) 10 Cal.4th 698, 709-710).

---

[9] The intervener defendants' request for judicial notice, filed on May 1, 2015, is granted except as to exhibit 3. Plaintiffs' request for judicial notice, filed on June 24, 2015, is denied except as to exhibits F, K, L, and T.

Plaintiffs did not attempt to establish that the statutes were applied unconstitutionally to a particular person, the type of challenge made in an as-applied case. (See *Tobe*, *supra*, 9 Cal.4th 1069, 1084.) Instead, plaintiffs' challenge "sought to enjoin *any* application of the [statutes] to *any* person in *any* circumstance." (See *id.* at p. 1087.) Plaintiffs' case, therefore, is properly characterized as a facial challenge.[10]

### C. Equal protection

The right to equal protection is guaranteed by the California Constitution. (Cal. Const., arts. I, § 7, subds. (a), (b), IV, § 16, subd. (a);[11] *Butt*, *supra*, 4 Cal.4th 668, 678.)

As its name suggests, equal protection of the laws assures that people who are "'similarly situated for purposes of [a] law'" are generally treated similarly by the law. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 (*Cooley*).) Thus, "'[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.'" (*Ibid.*, italics omitted.) The equal protection clause applies to laws that "'discriminate explicitly between groups of people,'" as well as laws that, "'though evenhanded on their face, in operation have a disproportionate impact on certain groups.'" (*Sanchez*, *supra*, 179 Cal.App.4th 467, 487; see also *Arcadia Unified*, *supra*, 2

---

[10]    Defendants contend that the 2015 amendments to the dismissal statutes render the plaintiffs' entire lawsuit moot. A lawsuit does not become moot on appeal when a statutory amendment leaves "a material portion of the statute" untouched. (*Californians for Political Reform Foundation v. Fair Political Practices Com.* (1998) 61 Cal.App.4th 472, 480.) The 2015 amendments to the dismissal statutes do not impact either the tenure statute or the reduction-in-force statute and do not significantly differ from the dismissal statutes in effect at the time of trial, at least with respect to the claims at issue here. Thus, they do not moot plaintiffs' case.

[11]    Article I, section 7, subdivision (a), of the California Constitution provides, in pertinent part, "[a] person may not be . . . denied equal protection of the laws. . . ." Article I, section 7, subdivision (b), provides "[a] citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens. . . ." Article IV, section 16, subdivision (a), states: "All laws of a general nature have uniform operation."

Cal.4th 251, 266 [claim that school transportation fees discriminated against poor may have had merit if not for payment exemption for indigent children]; *Hardy v. Stumpf* (1978) 21 Cal.3d 1, 7-8 (*Hardy*) [examining facially neutral physical agility test under equal protection inquiry]; *Personnel Administrator of Mass. v. Feeney* (1979) 442 U.S. 256 [employing equal protection review of a veterans' preference statute that operated to the disadvantage of women].)

When a statute affects similarly situated groups in an unequal manner, the court examines whether the Legislature has a constitutionally sufficient reason to treat the groups differently. (*In re Marriage Cases*, *supra*, 43 Cal.4th 757, 831.) One of two standards can apply to this analysis. (*Id.* at p. 832.) The first, "'rational relationship'" or "'rational basis'" review, is """"the basic and conventional standard for reviewing economic and social welfare legislation in which there is a 'discrimination' or differentiation of treatment between classes or individuals."""" (*Hernandez v. City of Hanford* (2007) 41 Cal.4th 279, 298 (*Hernandez*)). Under this test, a statutory classification will be upheld if it "'bear[s] some rational relationship to a conceivable legitimate state purpose.'" (*California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 209.) The second standard, "'strict scrutiny'" review, is employed when the "distinction drawn by a statute rests upon a so-called 'suspect classification' or impinges upon a fundamental right." (*In re Marriage Cases*, *supra*, 43 Cal.4th at p. 783.) When a statutory classification impinges a fundamental right (and does not involve a suspect classification), strict scrutiny will apply unless the effect on the fundamental right is merely "incidental," "marginal," or "minimal." (*Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 47; *In re Flodihn* (1979) 25 Cal.3d 561, 568; *Gould v. Grubb* (1975) 14 Cal.3d 661, 670 (*Gould*).) Under the strict scrutiny standard, """""*the state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.""""" (*In re Marriage Cases*, *supra*, 43 Cal.4th at p. 832; *Serrano I*, *supra*, 5 Cal.3d 584, 597.)

27

## II. Analysis

As explained above, plaintiffs contend that the challenged statutes create an oversupply of grossly ineffective teachers because (i) the tenure statute's probationary period is too short, preventing the identification of grossly ineffective teachers before the mandated deadline for reelection; (ii) when grossly ineffective tenured teachers are identified, it is functionally impossible to terminate them under the overly burdensome and complicated dismissal statutes; and (iii) when reductions-in-force are required, the statute requires the termination of junior, competent teachers while more senior, grossly ineffective teachers keep their jobs only because they have seniority. Plaintiffs argued, and the trial court agreed, that two distinct classes of students—Group 1 (an "unlucky subset" of students within the population of students at large) and Group 2 (poor and minority students)—were denied equal protection because the challenged statutes led members of these groups to be assigned to grossly ineffective teachers.

We examine whether plaintiffs demonstrated that the challenged statutes cause a certain class of students to suffer an equal protection violation.

### A. Group 1: No identifiable class under equal protection analysis

Plaintiffs describe Group 1 as an "unlucky subset" of the general student population that is denied the fundamental right to basic educational equality because students within this subset are assigned to grossly ineffective teachers. According to plaintiffs, the students comprising Group 1 are, in all pertinent respects, similar to the population of students at large, except for their exposure to grossly ineffective teachers. In the judgment, the trial court found that the challenged statutes are unconstitutional because they lead students within Group 1 to be assigned to grossly ineffective teachers and thereby have a real and appreciable impact on these students' fundamental right of education.

The trial court's judgment, however, omits analysis of a key preliminary question: Is the unlucky subset of students comprising Group 1 a sufficiently identifiable group for purposes of an equal protection action? "In equal protection analysis, the threshold question is whether the legislation under attack somehow discriminates against an

28

identifiable class of persons. [Citation.] Only then do the courts ask the further question of whether this identifiable group is a suspect class or is being denied some fundamental interest, thus requiring the discrimination to be subjected to close scrutiny." (*Altadena Library Dist. v. Bloodgood* (1987) 192 Cal.App.3d 585, 590 (*Altadena Library*); quoted approvingly in *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 258 (*Guardino*).)

Here, the unlucky subset is not an identifiable class of persons sufficient to maintain an equal protection challenge. Although a group need not be specifically identified in a statute[12] to claim an equal protection violation (see *Butt*, *supra*, 4 Cal.4th 668, 673; *Somers v. Superior Court* (2009) 172 Cal.App.4th 1407, 1414 (*Somers*)), group members must have some pertinent common characteristic other than the fact that they are assertedly harmed by a statute (see *Altadena Library*, *supra*, 192 Cal.App.3d 585, 590-591; *Guardino*, *supra*, 11 Cal.4th 220, 258).

The defining characteristic of the Group 1 students, who are allegedly harmed by being assigned to grossly ineffective teachers, is that they are assigned to grossly ineffective teachers. Such a circular premise is an insufficient basis for a proper equal protection claim. (See *Nelson v. City of Irvine* (9th Cir. 1998) 143 F.3d 1196, 1205 [dismissing an equal protection claim as "tautological" when the defining characteristic of the alleged class harmed was that they were allegedly harmed].) To avoid this circularity, a group must be identifiable by a shared trait other than the violation of a fundamental right.

Plaintiffs argue that a class need only be identifiable when the asserted equal protection violation stems from the differential treatment of a suspect class, rather than the infringement of a fundamental right. For support, they cite *Moreno v. Draper* (1999)

_____

**12**    Plaintiffs' "subset" of students is not identified in the text of the challenged statutes. Rather, the subject of the statutes is teachers and, although the text of the statutes may create classifications on their face, these classifications pertain to teachers: i.e., (i) the tenure statute classifies between probationary and tenured teachers; (ii) the dismissal statutes classify teachers by whether they are facing dismissal hearings; and (iii) the reduction-in-force statute classifies based on teachers' seniority.

70 Cal.App.4th 886, 893 (*Moreno*). But *Moreno* does not support their argument. The statute at issue in *Moreno*, which the plaintiff claimed infringed the fundamental right to raise one's children, "create[d] two classes of parents paying child support—those with children receiving public assistance and those with children *not* receiving public assistance." (*Id.* at p. 888.) Indeed, every equal protection case based on the infringement of a fundamental right has involved a class identified by some characteristic other than asserted harm. In *Butt,* the classes were the students of the Richmond Unified School District, who would be harmed by the closing of schools, and the students outside that district. (4 Cal.4th 668, 687.) In the *Serrano* cases, the impairment of the fundamental right to education was suffered by students living in relatively poor school districts, which had less taxable wealth and therefore, under the then-existent financing systems, lower levels of educational expenditures. In other words, students were impacted by the system based on their residency. (*Serrano I*, *supra*, 5 Cal. 3d 584, 592-595, 614; *Serrano II*, *supra*, 18 Cal.3d 728, 756-759, 765-766.) In *In re Marriage Cases*, the classes were defined by sexual orientation. (43 Cal.4th 757, 839.) And in *Gould*, which examined the constitutionality of an election procedure affording incumbents the top ballot position, the classes were defined by candidates (and their supporters) listed first on the ballot and those listed later. (14 Cal.3d 661, 664.)

In contrast, the unlucky subset constituting Group 1 is definable only by the characteristic that group members have assertedly suffered constitutional harm. What is more, the statutes do not assist plaintiffs with their definitional deficiency because they do not specify which students will be the "unlucky ones." In *Gould*, our Supreme Court held that a system that assigned ballot position randomly would not violate equal protection because, since all candidates had an equal chance of obtaining the top position, it would not "continually work a disadvantage upon a fixed class of candidates." (14 Cal.3d 661, 676.) The claimed effect on students here is analogous. Under plaintiffs' Group 1 theory, an unlucky subset of students will inevitably be assigned to grossly ineffective teachers. The chance that this will happen to any individual student, however, is random, as the challenged statutes do not make any one student more likely to be

30

assigned to a grossly ineffective teacher than any other student. Thus, the unlucky subset is nothing more than a random assortment of students. Moreover, because (according to the trial court's findings) approximately 1 to 3 percent of California teachers are grossly ineffective, a student in the unlucky subset one year will likely not be the next year, meaning that the group is subject to constant flux.

The claimed unlucky subset, therefore, is not an identifiable class sufficient to maintain an equal protection claim, and the judgment, insofar as it is based on plaintiffs' Group 1 theory, cannot be affirmed.

## B. Group 2: No inevitable constitutional violation

The trial court also found that poor and minority students (Group 2) suffered disproportionate harm from being assigned to grossly ineffective teachers. Race is generally considered a "suspect classification" under equal protection analysis.[13] (See *In re Marriage Cases*, *supra*, 43 Cal.4th 757, 843; *Weber v. City Council* (1973) 9 Cal.3d 950, 959.) In the context of education, under California law, wealth is considered a suspect classification as well. (See *Serrano I*, *supra*, 5 Cal.3d 584, 617; *Serrano II*, *supra*, 18 Cal.3d 728, 766.) Based on its finding of disproportionate harm, the trial court determined that strict scrutiny of the challenged statutes was appropriate. In making this determination, however, the trial court bypassed an initial question of the required analysis: Did the *challenged statutes* cause low-income and minority students to be disproportionately assigned to grossly ineffective teachers?

A statute is facially unconstitutional when the constitutional violation flows "inevitably" from the statute, not the actions of the people implementing it. (*Pacific*

---

[13]    Some cases have held that strict scrutiny only applies to a facially neutral statute that has a disproportionate impact on members of minority groups if discriminatory purpose or intent is shown. (See *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 568-569; *Sanchez*, *supra*, 179 Cal.App.4th 467, 487.) When such a statute impinges a fundamental right, however, strict scrutiny will apply, irrespective of motive or intent. (See *Crawford v. Board of Education* (1976) 17 Cal.3d 280, 297; *Hardy*, *supra*, 21 Cal.3d 1, 7-8.)

*Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180-181; *Arcadia Unified*, *supra*, 2 Cal.4th 251, 267.) This can occur when (1) the text of the statute mandates the constitutional violation (see *Serrano I*, *supra*, 5 Cal.3d 584, 603 [noting how the unequal "school funding scheme is mandated in every detail by the California Constitution and statutes"]); or (2) the constitutional violation, while not mandated by the statute's text, "inevitably" flows from the statute regardless of the actions of those administering it (see *Serrano II*, *supra*, 18 Cal.3d 728, 768-769 [noting how, in light of property-tax based school funding scheme, a poor school district "cannot freely choose to tax itself into an excellence . . ."]; *Serrano I*, *supra*, 5 Cal.3d 584, 611 [same]; *Sanchez*, *supra*, 179 Cal.App.4th 467, 487 [equal protection concerns apply to textually neutral law that has disproportionate impact]).

It is clear that the challenged statutes here, by only their text, do not inevitably cause poor and minority students to receive an unequal, deficient education. With respect to students, the challenged statutes do not differentiate by any distinguishing characteristic, including race or wealth.

Plaintiffs still could have demonstrated a facial equal protection violation, however, by showing that the challenged statutes, regardless of how they are implemented, inevitably cause poor and minority students to be provided with an education that is not "basically equivalent to" their more affluent and/or white peers. (See *Butt*, *supra*, 4 Cal.4th 668, 685.) It is possible, though not certain, that plaintiffs could have made such a showing by proving that any implementation of the statutes inevitably resulted in the consequential assignment of disproportionately high numbers of grossly inefficient teachers to schools predominantly serving low-income and minority students.[14]

---

**14**     We need not determine whether or how plaintiffs would actually meet their ultimate burden by such a hypothetical showing. The "exacting" standard for a facial constitutional challenge requires a showing of a constitutional defect "in at least '"the generality"' [citation] or 'vast majority' of cases [citation]." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 218.) Because plaintiffs

No such showing was made. Instead, the evidence at trial firmly demonstrated that staffing decisions, including teacher assignments, are made by administrators, and that the process is guided by teacher preference, district policies, and collective bargaining agreements. This evidence is consistent with the process set forth in the Education Code, which grants school district superintendents the power to assign teachers to specific schools or to transfer teachers between schools within a district, subject to conditions imposed by collective bargaining agreements, district policies, and by statute. (See § 35035, subds. (a), (e), (f).) Further, the evidence at trial showed what the text of the challenged statutes makes clear—that the challenged statutes do not in any way instruct administrators regarding which teachers to assign to which schools. Thus, it is administrative decisions (in conjunction with other factors), and not the challenged statutes, that determine where teachers are assigned throughout a district.

The trial court's conclusions do not support a contrary finding. In determining that the challenged statutes disproportionately affect Group 2 students, the trial court (i) cited to a CDE report stating that students attending high-poverty, low-performing schools are far more likely than wealthier peers to attend schools with a high number of underqualified, inexperienced, and ineffective teachers, and (ii) found that the "dance of the lemons" is caused by the lack of effective dismissal statutes and the reduction-in-force statute, and that it affects high-poverty and minority students disproportionately. Neither of these findings supports a conclusion that the challenged statutes determine where grossly ineffective teachers work. The CDE report relied on by the court does not suggest that the challenged statutes cause disparities in the assignment of poor or minority students to grossly ineffective teachers. Instead, it repeatedly documents the reason for higher concentrations of ineffective teachers in schools serving such students—the "counterproductive hiring and placement practices" of local administrators. Nor did the trial evidence show the "dance of the lemons" is inevitably caused by the

did not demonstrate any facial constitutional defect, they certainly did not show that such a defect existed in the generality or vast majority of cases.

statutes. Instead, as described at trial, the dance of the lemons is a process driven by local administrators. According to trial testimony, some principals rid their schools of highly ineffective teachers by transferring them to other schools, often to low-income schools. This phenomenon is extremely troubling and should not be allowed to occur, but it does not inevitably flow from the challenged statutes, and therefore cannot provide the basis for a facial challenge to the statutes. (See *Tobe*, *supra*, 9 Cal.4th 1069, 1102 [ordinance that did not inevitably conflict with constitutional right was not subject to valid facial challenge].)

Plaintiffs contend that the testimony of their expert witnesses supports their position that the challenged statutes cause grossly ineffective teachers to be disproportionately assigned to schools with large low-income and minority populations. These witnesses opined that grossly ineffective teachers "tend to" accumulate in schools serving minority students, and that the challenged statutes "could" be a cause. We are not required to defer to expert opinion regarding the ultimate issue in a case, particularly when the issue is a predominantly legal mixed question of law and fact. (See *Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178 ["There are limits to expert testimony, not the least of which is the prohibition against admission of an expert's opinion on a question of law"].) In any event, these opinions do not sustain plaintiffs' burden. The first opinion does not explain why grossly ineffective teachers "tend to" accumulate at certain schools, and the second opinion only indicates the statutes "could be" a cause, not that they are or, more importantly, *inevitably* are.

Nor have plaintiffs demonstrated that the challenged statutes inevitably lead to greater disruption at schools serving poor and minority students during reductions-in-force. Plaintiffs presented evidence that certain schools serving these students have higher numbers of inexperienced teachers and go through more layoffs than other schools. Witnesses for plaintiffs testified that this "constant churn" of staff is destabilizing. Again, while plaintiffs have identified a troubling problem, they have not properly targeted the cause. The challenged statutes do not inevitably lead to the assignment of more inexperienced teachers to schools serving poor and minority children.

34

Rather, assignments are made by administrators and are heavily influenced by teacher preference and collective bargaining agreements.

It is possible that the challenged statutes—in the way they pertain to teacher tenure and seniority—lead to a higher number of grossly ineffective teachers being in the educational system than a hypothetical alternative statutory scheme would. This possibility may present a problem with policy, but it does not, in itself, give rise to an equal protection violation, which requires a classification affecting similarly situated groups in an unequal manner. (*Cooley*, *supra*, 29 Cal.4th 228, 253.)

Assuming that poor and minority students encounter more grossly ineffective teachers and that this impacts their constitutional right to "basic educational equality" (*Butt*, *supra*, 4 Cal.4th 668, 681), the constitutional infringement is the product of staffing decisions, not the challenged statutes. Even if the statutes were struck down, the harm at issue—the disproportionate assignment of inferior teachers to poor and minority students—could still occur as before. (Any system will have some teachers who are not as effective as others.) And, since the challenged statutes, on their face and in effect, do not dictate where teachers are assigned, declaring the statutes facially unconstitutional would not prevent administrators from assigning the worst teachers to schools serving poor and minority students.

In sum, the evidence presented at trial highlighted likely drawbacks to the current tenure, dismissal, and layoff statutes, but it did not demonstrate a facial constitutional violation. The evidence also revealed deplorable staffing decisions being made by some local administrators that have a deleterious impact on poor and minority students in California's public schools. The evidence did not show that the challenged statutes inevitably cause this impact. Plaintiffs elected not to target local administrative decisions and instead opted to challenge the statutes themselves. This was a heavy burden and one plaintiffs did not carry. The trial court's judgment declaring the statutes unconstitutional, therefore, cannot be affirmed.

## DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court with directions to enter judgment in favor of defendants on all causes of action.  Each party shall bear its own costs on appeal.

CERTIFIED FOR PUBLICATION.


                                                BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.

36

Filed 8/22/16

Court of Appeal, Second Appellate District, Division Two - No. B258589
**S234741**

# IN THE SUPREME COURT OF CALIFORNIA
**En Banc**

_____

BEATRIZ VERGARA, a Minor, etc., et al., Plaintiffs and Respondents,

v.

STATE OF CALIFORNIA et al., Defendants and Appellants;

CALIFORNIA TEACHERS ASSOCIATION et al., Interveners and Appellants.
_____

The petition for review is denied.

Chin, Liu and Cuéllar, JJ., are of the opinion the petition should be granted.

_____
*Chief Justice*

STATEMENT

by Cantil-Sakauye, C. J.

The court, recently having resumed issuing, from time to time, statements by one or more justices dissenting from the denial of a petition for review, has adopted a policy that such statements, when they pertain to an appellate court opinion that has been published in the Official Reports, will also be published, appended to the original appellate court opinion in the Official Reports. With these policies now in place, separate statements will afford members of the court an opportunity to express their views regarding the denial of a petition for review, but of course any separate statement represents the views solely of the authoring justice or any justice signing the statement. In addition, it remains the case that an order denying review does not reflect the views of

1

the justices voting to deny review concerning the merits of the decision below. Rather, an order denying review represents only a determination that, for whatever reason, a grant of review is not appropriate at the time of the order. (See *People v. Davis* (1905) 147 Cal. 346, 349-350; see also, e.g., *People v. Triggs* (1973) 8 Cal.3d 884, 890-891.) Similarly, that a justice has not prepared, responded to, or joined a separate statement should not be read as reflecting the views of that justice concerning any separate statement that has been filed by any other justice.

Werdegar, Chin, Corrigan, Liu, Cuéllar and Kruger, JJ., concur.

DISSENTING STATEMENT

by Liu, J.

This case concerns the constitutionality of California's statutes on teacher tenure, retention, and dismissal. The plaintiffs are nine schoolchildren — Beatriz Vergara, Elizabeth Vergara, Clara Grace Campbell, Brandon Debose, Jr., Kate Elliott, Herschel Liss, Julia Macias, Daniella Martinez, and Raylene Monterroza — who attend California public schools. They allege that these statutes lead to the hiring and retention of what they call "grossly ineffective teachers" (i.e., teachers in the bottom 5 percent of competence) and that being assigned to a grossly ineffective teacher causes significant educational harm. Plaintiffs further allege that they have suffered or are at risk of suffering these harms and that the harms fall disproportionately on minority and low-income students. After hearing eight weeks of evidence, the trial court ruled that the challenged statutes violate the equal protection clause of the California Constitution (Cal. Const., art. I, § 7, subd. (a)), noting that the evidence of detrimental effects that grossly ineffective teachers have on their students "is compelling" and "shocks the conscience." The Court of Appeal reversed, holding that plaintiffs failed to establish a viable equal protection claim. (*Vergara v. State of California* (2016) 246 Cal.App.4th 619 (*Vergara*).)

Plaintiffs now seek this court's review. One of our criteria for review is whether we are being asked "to settle an important question of law." (Cal. Rules of Court, rule 8.500(b)(1).) Under any ordinary understanding of that criterion, our review is warranted in this case. As the trial court observed: "All sides to this litigation agree that competent teachers are a critical, if not the most important, component of success of a child's in-school educational experience. All sides also agree that grossly ineffective teachers substantially undermine the ability of that child to succeed in school." The controversy here is whether the challenged statutes are to blame for the hiring, retention, and placement of grossly ineffective teachers. Because the questions presented have obvious statewide importance, and because they involve a significant legal issue on which the Court of Appeal likely erred, this court should grant review. The trial court found, and

2

the Court of Appeal did not dispute, that the evidence in this case demonstrates serious harms. The nine schoolchildren who brought this action, along with the millions of children whose educational opportunities are affected every day by the challenged statutes, deserve to have their claims heard by this state's highest court.

## I.

As the Court of Appeal explained, this case involves equal protection claims by two groups of students. "Group 1" is "a 'subset' of the general student population, whose 'fundamental right to education' was adversely impacted due to being assigned to grossly ineffective teachers. According to plaintiffs, the students comprising this subset [are] located throughout the state, in all sorts of schools, and [are] of substantially the same age and aptitude as students of the general population. The Group 1 members [are] disadvantaged, however, because they received a lesser education than students not assigned to grossly ineffective teachers." (*Vergara*, *supra*, 246 Cal.App.4th at p. 629; see Cal. Const., art. IX, §§ 1, 5; *Serrano v. Priest* (1971) 5 Cal.3d 584, 607–609 [recognizing fundamental right to education under the Cal. Const.]; *Butt v. California* (1992) 4 Cal.4th 668, 685–686 (*Butt*) [same].) "Group 2" is "made up of minority and economically disadvantaged students. Plaintiffs alleged that schools predominantly serving these students have more than their proportionate share of grossly ineffective teachers, making assignment to a grossly ineffective teacher more likely for a poor and/or minority student." (*Vergara,* at p. 629.)

For reasons discussed by the Court of Appeal, there appear to be significant problems in plaintiffs' case with respect to Group 2. Quoting a report by the California Department of Education that was entered into the record, the trial court found that " '[u]nfortunately, the most vulnerable students, those attending high-poverty, low-performing schools, are far more likely than their wealthier peers to attend schools having a disproportionate number of underqualified, inexperienced, out-of-field, and ineffective teachers and administrators. Because minority children disproportionately attend such schools, minority students bear the brunt of staffing inequalities.' " Further, the trial court found that "the churning . . . of teachers" — that is, the recurring transfer of ineffective teachers from school to school — "caused by the lack of effective dismissal statutes and [the seniority-based reduction in force statute] affect high-poverty and minority students disproportionately." However, the record does not appear to include substantial evidence that the concentration of grossly ineffective teachers in poor and minority schools is caused by the challenged statutes as opposed to teacher preferences, administrative decisions, or collective bargaining agreements. The Court of Appeal, finding insufficient evidence of that causal link, held that plaintiffs failed to establish that the challenged statutes on their face violate equal protection by disadvantaging poor or minority students. (*Vergara*, *supra*, 246 Cal.App.4th at pp. 649–651.)

3

The Court of Appeal's treatment of Group 1 is more problematic. In overturning the trial court's judgment with respect to this group, the Court of Appeal said the group is not "an identifiable class of persons sufficient to maintain an equal protection challenge" because "to claim an equal protection violation [citations], group members must have some pertinent common characteristic other than the fact that they are assertedly harmed by a statute." (*Vergara*, *supra*, 246 Cal.App.4th at p. 646.) On this point, the Court of Appeal likely erred.

In *Butt*, *supra*, 4 Cal.4th 668, this court made clear that an equal protection challenge may be brought and will trigger strict scrutiny "whenever the disfavored class is suspect *or* the disparate treatment has a real and appreciable impact on a fundamental right or interest." (*Id.* at pp. 685–686.) There, the Richmond Unified School District decided to shorten its school year by six weeks because it had run out of money, and a group of parents claimed that this would violate their children's fundamental right to education. We said it is "well settled that the California Constitution makes public education uniquely a fundamental concern of the State and prohibits maintenance and operation of the common public school system in a way which denies basic educational equality to the students of particular districts. The State itself bears the ultimate authority and responsibility to ensure that its district-based system of common schools provides basic equality of educational opportunity." (*Id.* at p. 685.) Observing that the district's "students faced the sudden loss of the final six weeks, or almost one-fifth, of the standard school term originally intended by the District and provided everywhere else in California," we held that this "extreme and unprecedented disparity in educational service and progress" violated the state equal protection guarantee. (*Id.* at p. 687; see *id.* at p. 685 ["Whatever the requirements of the free school guaranty [(Cal. Const., art. IX, § 5)], the equal protection clause precludes the State from maintaining its common school system in a manner that denies the students of one district an education basically equivalent to that provided elsewhere throughout the State."].)

The students in *Butt* suffered a denial of equal protection not because they belonged to any identifiable class but because they were enrolled in a distressed school district. Here, as in *Butt*, students have asserted an equal protection claim on the ground that they are being denied significant educational opportunities that are afforded to others. The inequality in *Butt* arose from the fortuity of attending a school district that, unlike other districts, ran out of money. The inequality in this case arises from the fortuity of being assigned to grossly ineffective teachers who, in comparison to competent teachers, substantially impede their students' educational progress. The Court of Appeal's insistence that "to claim an equal protection violation [citations], group members must have some pertinent common characteristic other than the fact that they are assertedly harmed by a statute" (*Vergara*, *supra*, 246 Cal.App.4th at p. 646) appears inconsistent with *Butt*. The claim asserted by students in Group 1 is simply an instance of a cognizable equal protection claim alleging arbitrary deprivation of fundamental rights. (See, e.g., *People v. McKee* (2010) 47 Cal.4th 1172, 1197–1198 [classifications in

4

civil commitment laws are subject to strict scrutiny because the fundamental interest in liberty is at stake].)

The Court of Appeal cited *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220 and *Altadena Library District v. Bloodgood* (1987) 192 Cal.App.3d 585 in support of its view. Both of those cases relied on *Gordon v. Lance* (1971) 403 U.S. 1. All three cases involved constitutional challenges to supermajority voting schemes on the ground that voters who were members of a majority but not a supermajority would have their votes diluted. The plaintiffs in *Gordon* challenged a state requirement that any measure to raise taxes or incur bonded indebtedness be approved in a referendum by 60 percent of voters. The high court observed that it is permissible for the federal or state governments to constrain "majoritarian supremacy" in any number of ways. (*Gordon*, at p. 6.) What is constitutionally objectionable, as past cases had held, was "the denial or dilution of voting power because of group characteristics—geographic location and property ownership—that bore no valid relation to the interest of those groups in the subject matter of the election; moreover, the dilution or denial was imposed irrespective of how members of those groups actually voted." (*Id.* at p. 4.) *Guardino* and *Altadena*, both of which involved supermajority voting requirements on local tax measures, relied on *Gordon* in concluding that such requirements do not give rise to an equal protection claim unless the burdened voters comprise an identifiable class. (*Guardino*, at pp. 255–258; *Altadena*, at pp. 590–591.)

It is doubtful that the principle established in *Gordon* can be generalized beyond the context of voting rights. (See Elmendorf, *Structuring Judicial Review of Electoral Mechanics: Explanations and Opportunities* (2007) 156 U.Pa. L.Rev. 313, 327 [explaining that many laws burdening voting rights "receive light-touch judicial review" because "judicial review of election laws presents a distinctive set of challenges"].) The idea that vote dilution through supermajority requirements is constitutionally acceptable so long as no identifiable class is subject to discrimination has no analog when it comes to the fundamental right to education. As several leading constitutional law scholars explained in an amicus curiae letter in support of plaintiffs' petition for review, both state law and federal law have long recognized that plaintiffs asserting an equal protection claim involving a fundamental right need not be identifiable on a basis other than the alleged harm: "There is no basis in law or in logic for the Court of Appeal's central holding in this case that, without a showing that all the students injured by the challenged state laws share a 'common characteristic,' the Equal Protection claim they make is not 'meritorious' and cannot be 'maintained.' "

## II.

There is considerable evidence in the record to support the trial court's conclusion that the hiring and retention of a substantial number of grossly ineffective teachers in California public schools have an appreciable impact on students' fundamental right to

5

education. The trial court credited "a massive study" by Stanford economist Raj Chetty finding that "a single year in a classroom with a grossly ineffective teacher costs students $1.4 million in lifetime earnings per classroom." The trial court also cited a four-year study by Harvard economist and education professor Thomas Kane finding that "students in [the Los Angeles Unified School District] who are taught by a teacher in the bottom 5% of competence lose 9.54 months of learning in a single year compared to students with average teachers." Moreover, the trial court found "no dispute that there are a significant number of grossly ineffective teachers currently active in California classrooms" and cited testimony of the state's own expert estimating that 1 to 3 percent of California teachers are grossly ineffective, which translates to 2,750 to 8,250 teachers statewide.

The trial court also found that the challenged statutes substantially contribute to the hiring and retention of grossly ineffective teachers. The evidence is particularly suggestive with respect to the dismissal statutes. These statutes provide extensive procedural protections to teachers subject to dismissal for poor performance. (Ed. Code, §§ 44934, 44938, subd. (b)(1), (2), 44944, 44945.) At the time of trial, the laws required a district to first give a teacher a written statement of specific instances of unsatisfactory behavior, allow the teacher 90 days to improve, and then provide a written statement of charges and intent to dismiss. The teacher then had 30 days to request a hearing, which had to begin within 60 days of the request. The hearing was conducted by a three-member panel comprised of an administrative law judge, one teacher selected by the district, and one teacher selected by the teacher subject to the hearing. The panel had to issue a written decision, and the decision was subject to judicial review. If the district lost, it had to pay the hearing expenses and the teacher's attorney's fee. If the district won, the parties split the hearing expenses and paid their own attorney's fees. (*Vergara*, *supra*, 246 Cal.App.4th at pp. 630–631; see *id.* at pp. 631–632 [discussing 2015 amendments to the dismissal statutes].)

The trial court found that "it could take anywhere from two to almost ten years and cost $50,000 to $450,000 or more to bring these cases to conclusion under the Dismissal Statutes, and that given these facts, grossly ineffective teachers are being left in the classroom because school officials do not wish to go through the time and expense to investigate and prosecute these cases." The trial court did not dispute that providing teachers with due process before dismissal was a legitimate and even compelling interest. But it concluded that this interest could be pursued without what it called the "*über* due process" that leads to retention of grossly ineffective teachers. The trial court observed that classified (i.e., nonteacher) school employees, who are afforded due process rights to notice and a hearing under *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, "had their discipline cases resolved with much less time and expense than those of teachers."

The trial court also concluded that other features of the challenged statutes contribute to the hiring and retention of grossly ineffective teachers. California is one of

only five states with a two-year probation period before tenure, in contrast to three or more years in other states.  The trial court cited "extensive evidence presented, including some from the defense," that two years "does not provide nearly enough time for an informed decision to be made regarding the decision of tenure (critical for both students and teachers)."  Further, California is one of only 10 states that use seniority as the *sole* factor or as a factor that *must* be considered in laying off teachers.  (Ed. Code, § 44955, subds. (b), (c); see *id.*, § 44955, subd. (d) [narrow exceptions].)  The trial court noted that many other states either treat seniority as one factor that may be considered or leave layoff criteria to the district's discretion.  The trial court's findings do not suggest that teacher tenure invariably burdens students' fundamental right to education; instead, they suggest that California's particular scheme does.

### III.

Plaintiffs have styled this claim as an equal protection challenge, perhaps because this approach is supported by *Butt* and other cases that have applied strict scrutiny to equal protection claims alleging harms to fundamental rights.  With respect to Group 1, however, this lawsuit at bottom states a claim that the teacher tenure and dismissal statutes, to the extent they lead to the hiring and retention of grossly ineffective teachers, violate students' fundamental right to education.  Plaintiffs locate the source of that right in sections 1 and 5 of article IX of the California Constitution.  These are the same provisions at issue in *Campaign for Quality Education v. State of California* (2016) 246 Cal.App.4th 896, an education adequacy case in which this court also denies review today.  The two cases involve different yet complementary claims concerning the importance of resources and reform to improving the education system.  Both cases ultimately present the same basic issue:  whether the education clauses of our state Constitution guarantee a minimum level of quality below which our public schools cannot be permitted to fall.  This issue is surely one of the most consequential to the future of California.

Despite the gravity of the trial court's findings, despite the apparent error in the Court of Appeal's equal protection analysis, and despite the undeniable statewide importance of the issues presented, the court decides that the serious claims raised by Beatriz Vergara and her eight student peers do not warrant our review.  I disagree.  As the state's highest court, we owe the plaintiffs in this case, as well as schoolchildren throughout California, our transparent and reasoned judgment on whether the challenged statutes deprive a significant subset of students of their fundamental right to education and violate the constitutional guarantee of equal protection of the laws.

I respectfully dissent from the denial of review.

7

DISSENTING STATEMENT

by Cuéllar, J.

What Beatriz Vergara and eight of her fellow public school students allege in this case is that they, and vast numbers of children in our state's public schools, are burdened by certain statutes governing teacher dismissal, retention, and tenure that create a surplus of grossly ineffective teachers. After a 10-week bench trial, the trial court found that these statutes result in the denial of equal protection not only because they assign grossly ineffective teachers to classrooms where the children are disproportionately minority and poor, but also because the enduring effects of these statutes disproportionately burden an arbitrary subset of children. The evidence supporting this conclusion, according to the trial court, "shocks the conscience." In a public school system responsible for educating millions of children, "a single year in a classroom with a grossly ineffective teacher costs students $1.4 million in lifetime earnings per classroom." And students in the Los Angeles Unified School District "who are taught by a teacher in the bottom 5% of competence lose 9.54 months of learning in a single year compared to students with average teachers." Yet the statutes in question make it exceedingly difficult, the trial court concluded, to remove a grossly ineffective teacher from the classroom or properly evaluate a teacher before long-term employment is granted.

Beatriz Vergara and her fellow plaintiffs were part of that arbitrary group of thousands of children attending California public schools that the trial court found to be deprived of equal protection. According to the trial court, plaintiffs had "proven, by a preponderance of the evidence, that the Challenged Statutes impose a real and appreciable impact" to the detriment of these students' fundamental right to equality of education. At no time did the Court of Appeal dispute this conclusion. What was instead fatal to the claim advanced on behalf of the arbitrarily burdened children, according to the appellate court, was plaintiffs' failure to prove the existence of an identifiable group treated differently by the challenged laws, a group separate and apart from the individuals allegedly harmed by those laws.

Nothing in California's Constitution or any other law supports the Court of Appeal's reasoning. When a fundamental right has been appreciably burdened, we apply strict scrutiny. (See *Butt v. State of California* (1992) 4 Cal.4th 668, 685-686 (*Butt*); *Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 47 (*Fair Political Practices*); *Serrano v. Priest* (1971) 5 Cal.3d 584, 597 (*Serrano I*).) The appellate court did not. Instead it erected a novel barrier — not only for Beatriz Vergara and her fellow student plaintiffs, but for all California litigants seeking to raise equal protection claims based on a fundamental right. Such a right could be unquestionably burdened, the decision implies, but if that burden is imposed at random rather than on a discrete and identifiable group, then no relief is available under the equal protection provisions of our state Constitution. (See *Vergara v. State of California* (2016) 246 Cal.App.4th 619, 646

8

(*Vergara*) ["Here, the unlucky subset is not an identifiable class of persons sufficient to maintain an equal protection challenge. Although a group need not be specifically identified in a statute to claim an equal protection violation [citations], group members must have some pertinent common characteristic other than the fact that they are assertedly harmed by a statute" (fn. omitted)].)

Even if one ignores the appellate court's inconsistency with settled law, the question its approach begs is as simple as it is important: Why? Certainly not because we have ever held that arbitrarily denying the fundamental rights of schoolchildren — or any Californian — is acceptable when a burden is imposed more or less at random, by the anodyne machinery of a statutory system's gears and pulleys rather than by any person's deliberate choice to target some people instead of others. Would it make sense to treat as cognizable an equal protection claim to vindicate a fundamental rights violation — but only because *all* the affected children were victimized for wearing purple shirts, or because they happened to live in rural towns in Southern California — even as we cast aside the claims of the children in this case?

Beatriz Vergara and her fellow plaintiffs raise profound questions with implications for millions of students across California. They deserve an answer from this court. Difficult as it is to embrace the logic of the appellate court on this issue, it is even more difficult to allow that court's decision to stay on the books without review in a case of enormous statewide importance. We grant review where necessary to forestall infringement of a fundamental right. (See, e.g., *In re Marriage Cases* (2008) 43 Cal.4th 757, 809 [right to marry]; *Fashion Valley Mall, LLC v. National Labor Relations Board* (2007) 42 Cal.4th 850, 865 [right to free speech]; *Gould v. Grubb* (1975) 14 Cal.3d 661, 670 [right to vote].) This, too, is a case that merits review so we can address the problems with the Court of Appeal's approach in a matter of considerable statewide importance, and clarify that an equal protection claim under the California Constitution calls for searching scrutiny where it arises from the imposition of an impermissible burden on a fundamental right. And if the appellate court had addressed the fundamental rights issue perfectly against a legal backdrop that was crystal clear, there still would be compelling reasons to grant review.

## I.

We treat certain rights as fundamental under the California Constitution — the right to vote, for example, or to marry, to access our courts, to an expectation of privacy, and to an education — because they are foundational to how we choose to define our personal and civic lives. But it would border on madness to think that because these rights are fundamental, we can routinely expect perfection when the state protects — or through its activities, vindicates — these rights. The nature of any person's actual relationship to his or her fundamental rights is as much affected by ordinary governance – – polling place and school locations, routine agency practices, long-past histories, and

9

unexpected emergencies — as it is by a shared aspiration articulated in constitutional text or a judicial opinion that government honor such rights. Yet these realities make it even more important to distinguish routine shortcomings of implementation, or instances where government legitimately chooses to harmonize competing goals in a given way, from the infringement of a fundamental right by the imposition of an appreciable burden thereon.

The trial court found that such a burden was shown to exist in this case. The evidence, according to the trial court, established that the quality of education received by California's millions of schoolchildren depends substantially on the quality of instruction. The evidence further established that the existence of a substantial number of grossly ineffective teachers in the California school system — about 1 to 3 percent statewide, or 2,750 to 8,250 teachers — "has a direct, real, appreciable, and negative impact on a significant number of California students." Yet teacher dismissals "could take anywhere from two to almost ten years and cost $50,000 to $450,000 or more to bring these cases to conclusion under the Dismissal Statutes, and that given these facts, grossly ineffective teachers are being left in the classroom because school officials do not wish to go through the time and expense to investigate and prosecute these cases." There was also evidence, which the trial court credited, showing that two years is too short a time to properly evaluate teacher competence, and that California is one of only 10 states that use seniority as the sole factor in determining whether to lay off teachers. The Court of Appeal never disputed these findings.

These findings instead failed to justify a remedy, according to the Court of Appeal, because there was no identifiable group explicitly targeted or uniquely burdened by the statutes. This conclusion is, at best, in stark tension with settled law. We have long recognized that equal protection challenges may be brought "whenever the disfavored class is suspect *or* the disparate treatment has a real and appreciable impact on a fundamental right or interest." (*Butt*, *supra*, 4 Cal.4th at pp. 685-686.) Strict scrutiny applies to both types of equal protection claims. (See *ibid.*; see also *Fair Political Practices*, *supra*, 25 Cal.3d at p. 47 ["It is only when there exists a real and appreciable impact on, or a significant interference with the exercise of the fundamental right that the strict scrutiny doctrine will be applied"].)

We can understand plaintiffs' claims here as involving equal protection grounded in a fundamental interest, or as ultimately predicated more directly on the argument that a fundamental interest has been unduly burdened. Under either conception, the Court of Appeal failed to appreciate the distinction we have drawn between claims involving a fundamental interest and those centered on a suspect class. To state a fundamental interest claim sounding in equal protection, the alleged disparate treatment need not be focused on a suspect class. (See *Bd. of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 914; accord, *Bullock v. Carter* (1972) 405 U.S. 134, 144 [finding a denial of equal protection even though the affected group "cannot be described by

10

reference to discrete and precisely defined segments of the community"].)  When a fundamental interest is at stake, the sole preliminary inquiry is whether the challenged law has a real and appreciable impact on the exercise of that interest.  (*Butt*, *supra*, 4 Cal.4th at p. 686; accord, *Bullock*, at p. 144; see generally *Engquist v. Oregon Dept. of Agriculture* (2008) 553 U.S. 591, 597 ["It is well settled that the Equal Protection Clause 'protect[s] persons, not groups . . . .' "].)  If it does, the law will be invalidated unless the state can show it is necessary to achieve a compelling governmental interest.  (*Serrano I*, *supra*, 5 Cal.3d at p. 610.)  It is no answer under any standard of review — much less strict scrutiny — that violations of a fundamental right will be tolerated so long as they are felt at random.

And even if the law were more opaque, my doubts are grave about whether one could articulate a reasonable understanding of fundamental rights under the California Constitution that would countenance the imposition of material burdens on those rights without strict scrutiny or even the opportunity for judicial review under any standard, so long as those burdens were imposed largely at random.  Invidious classifications deserve strict scrutiny even where fundamental rights are not at issue, while ordinary instances of treatment that could arguably be described as unequal do not merit particularly searching scrutiny where they do not involve fundamental rights.  Where fundamental rights are at issue, however, we have never held that an equal protection challenge may proceed without the searching scrutiny that fundamental rights merit.  We shouldn't start now simply because those rights may have been burdened arbitrarily.  True:  Arbitrary selection has at times been considered a means of rendering a governmental decision legitimate.  (See Samaha, *Randomization in Adjudication* (2009) 51 Wm. & Mary L.Rev. 1, 24-27.)  But where an appreciable burden results — thereby infringing a fundamental right — arbitrariness seems a poor foundation on which to buttress the argument that the resulting situation is one that should not substantially concern us.

Just as the arbitrariness of the alleged injury is no cause to deny review, neither is the nature of the fundamental right so injured.  That education is the right at issue has posed no insurmountable bar in the past.  (See *Butt*, *supra*, 4 Cal.4th at p. 686 ["education is . . . a fundamental interest for purposes of equal protection analysis under the California Constitution"]; *Serrano I*, *supra*, 5 Cal.3d at pp. 608-609 ["We are convinced that the distinctive and priceless function of education in our society warrants, indeed compels, our treating it as a 'fundamental interest' "].)  Why should we treat differently the material interference with a fundamental right arising from the challenged statutes — interference the trial court found to exist, and the Court of Appeal did not dispute — from the disruption occasioned by a shorter school year (see *Butt*, at p. 686), or the drastic inequities in funding that undermine equal access to an education (see *Serrano I*, at pp. 590-591)?  The harmful consequences to a child's education caused by grossly ineffective teachers — the evidence for which the trial court found compelling — are no less grave than those resulting from a shortened period of instruction or financial shortfalls.

11

In considering this case, we must respect the role of the representative branches of government and the public itself in shaping education policy. But our responsibility to honor the court's proper constitutional role makes it as important for us to review a case that merits our attention as it is for us to avoid a dispute beyond the court's purview. This case is the former. It squarely presents significant questions of state constitutional jurisprudence that our court, rather than the Legislature or the executive branch, is best suited to address. Moreover, even in a world where we clarify our fundamental rights jurisprudence as this case requires — and address concerns associated with the Court of Appeal's decision — considerable room would remain for the legislative and executive branches to decide how best to address the important balance between honoring the fundamental right to education and addressing other goals, such as retaining protections for public employees from arbitrary dismissal.

Had we accepted our charge to ensure uniformity of decision on legal issues of statewide importance (see Cal. Rules of Court, rule 8.500(b)(1)), and had we declined to adopt the Court of Appeal's approach, I am confident we would have appreciated the practical constraints that sometimes result in different educational inputs or outcomes for different children. Our track record suggests as much. (See *Butt*, *supra*, 4 Cal.4th 668; *Serrano I*, *supra*, 5 Cal.3d 584.) But there is a distinction between such conventional differences and what the trial court concluded was occurring as a result of these statutes — namely, that they resulted in "a direct, real, appreciable, and negative impact on a significant number of California students." That is a difference we should not ignore. For it is certainly possible to conclude that the extent of the interference with students' fundamental right to education has legal consequences, while at the same time acknowledging the role of the Legislature and the importance of maintaining flexibility within the context of the state's constitutional responsibility to honor this most fundamental right.

## II.

The Court of Appeal also failed to apply the standard for facial constitutional challenges that ordinarily governs cases involving fundamental rights. (See *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 343 (*American Academy*) [requiring proof of a constitutional conflict in only "the vast majority of [the law's] applications"].) What the appellate court did instead is apply the more stringent "must be unconstitutional in all its applications" standard, without any apparent justification. (See *Vergara*, *supra*, 246 Cal.App.4th at pp. 643, 648.) At a minimum, the court did not wrestle with the "uncertainty" in our case law surrounding the governing standard for facial constitutional challenges. (*Today's Fresh Start, Inc. v. Los Angeles County Office of Educ.* (2013) 57 Cal.4th 197, 218.) By granting review, we could have brought much-needed clarity to this frequently recurring issue of constitutional law.

The court below concluded that a successful facial challenge depends on showing that the challenged law " ' "inevitably pose[s] a present total and fatal conflict with applicable constitutional prohibitions" ' " in all the law's applications. (*Vergara*, *supra*, 246 Cal.App.4th at p. 643; accord, *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 181.) Only rarely have we applied the more stringent standard alone (see *East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693, 709), and not when a fundamental right is involved (see *American Academy*, *supra*, 16 Cal.4th at p. 343 ["a facial challenge to a statutory provision that broadly impinges upon fundamental constitutional rights may not be defeated simply by showing that there may be some circumstances in which the statute constitutionally could be applied"]). In fundamental rights cases, we require a showing of unconstitutionality in only "the vast majority of [the law's] applications." (*Ibid.*) Had the Court of Appeal applied this standard, and properly deferred to the trial court's factual findings on causation, it is difficult to see how it could have rejected the trial court's conclusions.

The Court of Appeal also appears to have confused the question of whether a facially discriminatory statute exists with the question of what showing is required to prove that statute is invalid on its face. "Because plaintiffs did not demonstrate any facial constitutional defect," the appellate court stated in a footnote, "they certainly did not show that such a defect existed in the generality or vast majority of cases." (*Vergara*, *supra*, 246 Cal.App.4th at p. 649, fn. 14.) Not so. Just because a statute does not discriminate on its face — i.e., does not "demonstrate any facial constitutional defect" — does not necessarily mean a facial challenge to that statute does not lie. If this were the case, facial challenges in this day and age would be dead on arrival. Moreover, it cannot be that because plaintiffs failed to satisfy the more stringent standard for bringing a facial challenge they, by necessity, failed to satisfy the less stringent one. What determines instead whether plaintiffs have succeeded in making such a challenge is whether they must prove a constitutional conflict in all of the statute's applications, or in just the great majority of them. This is precisely the uncertainty we could have clarified by granting review.

## III.

There is no right without an adequate remedy. And no such remedy exists without review by a court of last resort when the decision of the appellate court, the importance of the case, and the question presented so clearly merit review. Denying review in this case leaves in place a decision that is in considerable tension with existing law and accepts with little explanation the notion of material interference with the fundamental right to an education — interference that the trial court here found was caused by the challenged statutes. The Court of Appeal then concluded that our law permits the wanton imposition of material burdens on or even deprivations of fundamental rights, as long as such imposition is sufficiently wanton that the burden does not fall on an "identifiable group" defined by some characteristic other than the burden imposed by the statutes themselves.

13

No one should doubt that plaintiffs' lawsuit raises difficult questions and implicates a variety of concerns, including the importance of protecting public employees from arbitrary dismissal. (See *California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 335-336 [explaining that because "the state not only has monopolized the process of determining whether permanent public school teachers should be dismissed or suspended, but it also is the entity seeking to deprive teachers of their constitutionally protected liberty and property interests," it is therefore "required by the due process guarantee to provide the teacher a meaningful hearing"].) Public institutions must often reconcile their protection of a fundamental right with the realities of governing, the resolution of competing priorities, and the imperfections of any system forged and adapted by human hands. But here, the trial court concluded that a fundamental right was infringed when it was appreciably burdened by statutes protecting grossly ineffective teachers — and the evidence "shock[ed] the conscience." There is a difference between the usual blemishes in governance left as institutions implement statutes or engage in routine trade-offs and those staggering failures that threaten to turn the right to education for California schoolchildren into an empty promise. Knowing the difference is as fundamental as education itself. Which is why I would grant review.